**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GROVER MARKS, the Administrator
of the Estates of Elaine Cleavenger
and Jamie Cleavenger and Co-
Administrator of the Estate of
Robert Cleavenger; DAWN LYNN
KISNER, Co-Administrator of the
Estate of Robert Cleavenger;
ROSEANNA MARKS, as Legal
Guardian of Jessie Cleavenger,
                *Plaintiffs-Appellants,*

v.

SHELLEY WATTERS; MANAGED CARE
SERVICES MAINSTAY OF CENTRAL
PENNSYLVANIA, INCORPORATED,
                *Defendants-Appellees,*

and                                            No. 02-1486

WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES;
WILLIAM R. SHARPE, JR. HOSPITAL;
AHMED ABORAYA, M.D.; SAFIULLAH
SYED, M.D.; RICHARD SEIME;
COVENTRY HEALTH CARE
MANAGEMENT CORPORATION, d/b/a
Health Assurance; WEST VIRGINIA
UNIVERSITY, BOARD OF TRUSTEES, a
Corporation; WEST VIRGINIA
UNIVERSITY SCHOOL OF MEDICINE,
DEPARTMENT OF BEHAVIORAL
MEDICINE AND PSYCHIATRY; WEST
VIRGINIA UNIVERSITY HOSPITALS
INCORPORATED, a Corporation;

RAMSAY HEALTH CARE,
INCORPORATED; PSYCHIATRIC
INSTITUTE OF WEST VIRGINIA, d/b/a
Chestnut Ridge Behavioral Health
Systems; JACK CLOHAN; ABE ADEL,
M.D.; SCOTT POLLARD, M.D.;
MADONNA ROACH, R.N.; FLORENCE
HATTON; GREAT-WEST LIFE &
ANNUITY INSURANCE COMPANY;
COVENTRY HEALTH & LIFE INSURANCE
COMPANY, d/b/a Health Assurance,
formerly known as American
Service Life Insurance Company,
                                  *Defendants.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph Robert Goodwin, District Judge.
(CA-01-961-2)

Argued: December 5, 2002

Decided: March 14, 2003

Before NIEMEYER, WILLIAMS, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Mary Donne Peters, GORBY, REEVES, PETERS & BURNS, P.C., Atlanta, Georgia, for Appellants. Thomas V. Flaherty, FLAHERTY, SENSABAUGH & BONASSO, P.L.L.C., Charleston,

West Virginia, for Appellees. **ON BRIEF:** James W. Standard, Jr., GORBY, REEVES, PETERS & BURNS, P.C., Atlanta, Georgia, for Appellants. Nathaniel K. Tawney, FLAHERTY, SENSABAUGH & BONASSO, P.L.L.C., Charleston, West Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

After his release from an inpatient mental healthcare facility, Robert Cleavenger murdered his wife and daughter, injured his son, and then committed suicide. The representatives of Cleavenger and his family filed a broad complaint for damages against all of the healthcare providers involved in Cleavenger's care, as well as against the companies insuring and managing Cleavenger's healthcare benefits provided by his employer. Their complaint, filed in a West Virginia State court, alleged medical malpractice, negligent supervision, negligent monitoring, negligent healthcare management, and vicarious liability, all under the State law of West Virginia.

Cleavenger's healthcare insurer removed the case to federal court under 28 U.S.C. §§ 1441 and 1331, asserting that the claims against it and related defendants were "completely preempted" by § 502(a) of the Employee Retirement Income Security Act ("ERISA"). The plaintiffs moved to remand the case to State court on the ground that their claims challenged mixed decisions of plan administration and patient treatment and that, under *Pegram v. Herdrich*, 530 U.S. 211 (2000), such claims are not preempted by ERISA. The district court denied the plaintiffs' motion to remand because their claims against the healthcare insurers challenged purely administrative decisions under the plan and were thus completely preempted by ERISA. The district court then considered the merits of plaintiffs' preempted claims, which it treated as ERISA claims, and entered summary judgment against the plaintiffs on those claims. Finally, the court remanded the remaining state-law claims to State court.

On appeal, the plaintiffs challenge (1) the district court's order denying their motion to remand and (2) the district court's summary

judgment on the ERISA claims. For the reasons that follow, we affirm.

I

Robert Cleavenger was employed by Mountaineer Retreading, Inc. in Clarksburg, West Virginia, and in connection with his employment, Mountaineer Retreading provided Cleavenger employee benefits, including healthcare benefits through a preferred provider organization plan (a "PPO plan") insured by Health Assurance. For the premiums paid, Health Assurance agreed to pay Mountaineer Retreading's employees for 100% of the costs of medical care provided to them by participating healthcare providers — those who agreed to offer healthcare pursuant to a fee schedule — and 80% of the costs of care provided by nonparticipating providers. Cleavenger's PPO plan, which detailed the scope of coverage as well as its limitations, provided coverage for mental illness, including coverage for 45 days in an inpatient mental health facility and outpatient psychiatric consultations.

Health Assurance subcontracted with Managed Care Services Mainstay of Central Pennsylvania, Inc. ("Mainstay") to manage the behavioral healthcare component of its PPO plan. This subcontract required Mainstay to provide "certain mental health and chemical dependency outpatient and inpatient professional and technical services and related provider contracting and credentialing, utilization management and quality improvement services." These services that Mainstay undertook to provide included determinations of employee eligibility, the medical necessity of services, the resolution of grievances, and claims payment. Mainstay provided these services to employees through case managers whom they designated in connection with each claim. In this case, Mainstay designated Shelley Watters as the case manager to perform utilization review services in connection with Cleavenger's treatment.

In October 1998, while covered by his employee benefit plan, Cleavenger was hospitalized at the William R. Sharpe, Jr. Hospital ("Sharpe Hospital") in Weston, West Virginia, after he attempted suicide by ingesting three bottles of pills and slitting his wrist. His suicide attempt came shortly after he assaulted his wife upon learning

that she was having an affair with another man. He wrote a suicide note describing his inability to bear the pain of his wife's rejection. Cleavenger was rushed to the emergency room, treated, and involuntarily committed to Sharpe Hospital for monitoring and treatment.

At Sharpe Hospital, Cleavenger received four days of inpatient treatment for depression. After he was admitted, Mary Ann Iquinto, a Sharpe Hospital nurse, called Cleavenger's insurer to determine Cleavenger's insurance coverage, as she routinely did for newly admitted patients. Health Assurance referred Iquinto to Mainstay and to Shelley Watters. After learning of Cleavenger's suicide attempt and self-injurious behavior, Watters authorized payment to Sharpe Hospital for Cleavenger's inpatient services. She also told Iquinto that because Sharpe Hospital was not a participating provider under Cleavenger's insurance policy, Cleavenger would be responsible for a 20% co-pay.

The next day, October 7, 1998, Watters called Iquinto to inquire about Cleavenger's condition and was advised that Cleavenger remained on a suicide watch and that Sharpe Hospital planned to continue to monitor him closely to see if he would stabilize and to increase his social interaction. During the conversation, Watters authorized payment for Cleavenger's continued inpatient care.

Dr. Ahmed Aboraya, Cleavenger's treating physician at Sharpe Hospital, observed that over the next two days Cleavenger was doing "fairly well," and he stopped the 15-minute checks made as part of the suicide watch. He also noted Cleavenger was neither delusional nor psychotic and that he no longer posed a risk of harm to himself or others.

After the first couple of days in the hospital, Cleavenger began to express concern to Dr. Aboraya that if he stayed in the hospital too long he would lose his job. Dr. Aboraya noted that it was Cleavenger's "will and his request that he want[ed] to go home and continue to his job and continue the therapy as an outpatient." Based on Cleavenger's improved condition, Dr. Aboraya did not believe that the hospital could keep Cleavenger against his will. Dr. Aboraya met with a team of nurses and a social worker, explained that Cleavenger requested discharge, and asked whether there were any concerns

about releasing him. Everybody on the team agreed that, under West Virginia law, there was no basis for holding Cleavenger against his will, and so Dr. Aboraya noted on Cleavenger's chart, "Discharge the patient on Friday [October 9, 1998]." Dr. Pollard, a Sharpe Hospital doctor who observed Cleavenger and who had the authority to override Dr. Aboraya's discharge decision, agreed with Dr. Aboraya's decision.

Cleavenger was released on Friday, October 9, 1998, from Sharpe Hospital. Florence Hatton, the social worker on the unit at that time, wrote up a psychological assessment of Cleavenger and a plan for his outpatient care. Dr. Aboraya had only specified that Cleavenger needed a psychologist who specialized in marital problems, and he did not specify where Cleavenger should go for outpatient care. He left that decision to Florence Hatton. Although both Valley Community Mental Health Center, Inc. ("Valley Center") and University Health Associates at Chestnut Ridge Hospital ("University Associates") were options for outpatient care — and both were, in Dr. Aboraya's estimation, "similar clinics" — Hatton noted that Cleavenger "stated he did not want to go to Valley [Center]," even though it was the facility closer to Cleavenger's residence. Hatton thus contacted University Associates and set up an appointment for Cleavenger for October 12, 1998.

Watters, who had learned that Cleavenger was being released, sent Cleavenger a letter, introducing herself as his case manager and indicating that she would continue to follow his treatment after discharge and contact him by telephone to assess his post-hospitalization status. She also learned that Sharpe Hospital had set up an appointment for Cleavenger at University Associates for October 12. After October 12, Watters called Cleavenger to determine whether he had kept his appointment at University Associates, but Cleavenger never returned her call. Watters' October 15 notes indicate that University Associates told her that Cleavenger kept his first appointment, although University Associates doubts that they would have communicated that information, as Cleavenger never showed up. Watters continued to attempt to reach Cleavenger but to no avail. Having not heard from him and assuming that Cleavenger was keeping his appointments, Watters closed her file on Cleavenger.

In fact, on the day of his release from the hospital, Cleavenger contacted University Associates to change his outpatient appointment that was scheduled for October 12 because it conflicted with his return to work. Cleavenger also postponed his next appointment on October 16 in order to take his son to the dentist. One day later, on October 17, 1998, Cleavenger killed his wife and daughter with a knife, injured his son, and committed suicide by jumping head first from a second-story window of the family's home.

The plaintiffs, who are representatives of the estates of Cleavenger, his wife, and his daughter, as well as the guardian of his surviving son, commenced this action for damages in State court, asserting various state-law claims of negligence and vicarious liability against doctors, healthcare organizations, and insurance-related entities based on the decision to release Cleavenger from the hospital to outpatient care. In their complaint against Watters, the plaintiffs alleged that she was negligent in

> a) failing to adequately monitor Robert Cleavenger during his out-patient treatment; b) failing to obtain or otherwise cause the readmission of Robert Cleavenger to the Sharpe Hospital or other inpatient facility once it became apparent that Robert Cleavenger was non-compliant with out-patient treatment services designed to monitor his recovery from his mental illness; and c) failing to provide adequate warnings to Robert Cleavenger's family members, who were foreseeable victims of Robert Cleavenger's mental illness, as to signs and symptoms of Robert Cleavenger's remission.

Their complaint against Mainstay alleged only that Mainstay was vicariously liable for Watters' negligence. Plaintiffs sought damages for funeral and medical expenses, pain and suffering, and lost earnings, among other things.

After Health Assurance, with the consent of the other defendants, removed this case to federal court on the ground that the claims against it as well as Mainstay and Watters were preempted by ERISA, plaintiffs filed a motion to remand this case to State court, arguing that Mainstay and Watters had an active role in "the decision as to the type and quality of health care Robert Cleavenger received in October

of 1998" and that such mixed decisions involving both eligibility for coverage and treatment were not subject to preemption under ERISA, but rather were subject to state-law malpractice jurisprudence. The district court rejected that argument and denied plaintiffs' motion to remand, concluding that because plaintiffs' case against Mainstay and Watters "related to the administration of plan benefits, and not to the provision of medical care," it had to be brought under ERISA, if at all. The court concluded:

> [P]laintiffs cannot escape the facts that Mainstay never purported to provide Cleavenger with medical services, that Cleavenger's treating physicians were fully insulated from the utilization review procedures performed by Mainstay, and that Watters never spoke directly with Cleavenger's physicians and had no input into Cleavenger's referral to outpatient care. Cleavenger was discharged and referred to outpatient therapy not because of a Mainstay policy that determined level of care, but because his treating physicians concluded that was the most appropriate level of treatment. It was the treating physicians at Sharpe who were the arrangers of Cleavenger's care, not Mainstay or Shelley Watters. Mainstay was performing a purely administrative role.

> * * *

> At bottom, plaintiffs' claims against Shelley Watters and Mainstay attack the administration of Cleavenger's benefits. Plaintiffs essentially complain that the administration of the PPO Plan led to Cleavenger's being referred to outpatient care. These claims go to plan administration, not provision of medical services.

The district court also concluded that plaintiffs failed to establish a claim under ERISA and entered summary judgment against them.

From the district court's orders denying remand and granting summary judgment to Mainstay and Watters, the plaintiffs filed this appeal.

## II

Plaintiffs' principal argument on appeal is that the district court erred in concluding that their state-law claims against Mainstay and Watters were preempted by ERISA and in denying their motion to remand this case to State court on that basis. They contend that ERISA does not preempt their claims against Mainstay and Watters because these claims challenge "mixed eligibility and treatment" decisions — i.e., decisions in which plan administration and medical judgment are inextricably intertwined. Such mixed eligibility and treatment claims, they assert, remain state-law claims and are not preempted by ERISA under the rationale of *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (holding that a claim of fiduciary breach by an HMO physician making a mixed decision of eligibility and treatment "boil[s] down to a malpractice claim, and the fiduciary standard could be nothing but the malpractice standard traditionally applied in actions against physicians" so that ERISA would not govern such a claim).

We begin by reviewing the nature and scope of ERISA's preemption generally. ERISA was enacted to protect the interests of participants in employee benefit plans and their beneficiaries by, among other things, "establishing standards of conduct, responsibility, and obligation for fiduciaries of employment benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). Its regulation "extends to [plans] that provide 'medical, surgical, or hospital care or benefits' for plan participants or their beneficiaries 'through the purchase of insurance or otherwise.'" *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650-51 (1995) (quoting ERISA § 3(1), 29 U.S.C. § 1002(1)). Recognizing "the reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans as ERISA's crowning achievement," the legislation's sponsors "emphasized both the breadth and importance of the pre-emption provisions" to "establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (internal quotation marks and citations omitted). Thus, § 514(a) of ERISA provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This "broad" and "ex-

pansive" preemption clause, *Pilot Life*, 481 U.S. at 47, thus provides a federal law defense to all common-law causes of action that "relate to" an employee benefit plan, unless ERISA expressly excepts the cause of action from ERISA's preemption provision, *id.* at 48.

Having preempted a field defined by claims relating to an ERISA plan, ERISA precludes the prosecution of preempted state-law claims that are not otherwise saved from preemption under § 514(b)(2)(A) unless they fall within the scope of the exclusive civil enforcement mechanism provided by § 502(a) of ERISA, 29 U.S.C. § 1132(a), in which case they must be treated as federal causes of action under § 502(a). Section 502(a) authorizes participants or beneficiaries to file civil actions to, among other things, recover benefits, enforce rights conferred by an ERISA plan, remedy breaches of fiduciary duty, clarify rights to benefits, and enjoin violations of ERISA. Thus, if a state-law claim preempted by § 514 is not included within the scope of § 502(a), the claim is susceptible to a § 514 defense, whether it is brought in State or federal court. But if a state-law claim falls within the scope of § 502(a), it is "completely preempted" and therefore treated as a federal cause of action. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66-67 (1987).

Stated otherwise, under the scheme established by Congress, ERISA § 514 preempts a field defined by claims relating to employee benefit plans regulated by ERISA that are not otherwise subject to ERISA's saving clause and, once having occupied that field, limits civil enforcement to claims provided in § 502(a). Any claim falling within the field but not within the scope of § 502(a) is preempted and must be dismissed, and any claim falling within the scope of § 502(a) becomes exclusively a federal cause of action. Thus, simple preemption under § 514 precludes prosecution of the preempted state-law claim, but "complete preemption" exists when the preempted state-law claim falls within the scope of the exclusive civil enforcement mechanism of § 502, in which case the state-law claim is converted into a federal cause of action removable to federal court. *Metropolitan Life*, 481 U.S. at 66-67; *see also In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999) ("It is important to distinguish complete preemption under § 502(a) of ERISA, which is used in this sense as a jurisdictional concept, from express preemption under § 514(a) of ERISA, which is a substantive concept governing the applicable

law"); *Warner v. Ford Motor Co.*, 46 F.3d 531, 535 (6th Cir. 1995) ("Removal and preemption are two distinct concepts").

Because a state-law claim that is completely preempted under § 502(a) becomes a federal cause of action, it may be removed to federal court under 28 U.S.C. §§ 1331 and 1441 even if it is pleaded only as a state-law claim. As the Supreme Court explained in *Metropolitan Life*,

> Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to a federal court. *Gully v. First National Bank*, [299 U.S. 109 (1936)]. One corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims [within the scope of § 502(a)] is necessarily federal in character.

481 U.S. at 63-64.

Accordingly, the question presented in this case is whether the plaintiffs' claims against Mainstay and Watters fell within the scope of § 502(a). If they did, then their claims were properly treated as federal causes of action and their removal to federal court was appropriate. On the other hand, if they did not fall within the scope of § 502(a), then their remand to State court would be required, even though § 514 might provide a defense to them in State court.

We now turn to plaintiffs' claims and begin by noting that plaintiffs have conceded that they are beneficiaries or participants under an employee benefit plan provided by Mountaineer Retreading, Inc. to Robert Cleavenger, one of its employees. They also concede that there is no dispute that the inpatient and outpatient care that is involved in this action was "covered under Mr. Cleavenger's health care plan" provided by Mountaineer Retreading and that the plan was regulated by ERISA. Finally, they recognize that Cleavenger's benefits for mental illness were managed by Mainstay pursuant to a contractual arrangement between it and the plan.

Plaintiffs' argument focuses on the contention that their claims against Mainstay and Watters arise out of "mixed eligibility and treatment decisions" made by Mainstay and Watters. They argue that such mixed eligibility and treatment decisions are governed by State law under the holding of *Pegram v. Herdrich*, 530 U.S. 211 (2000), which essentially held that duties exercised in such mixed decisions arise from State common-law malpractice jurisprudence, which Congress did not preempt under § 514 of ERISA.

In *Pegram*, the Supreme Court considered an HMO's simultaneous duties as both an ERISA plan administrator and a healthcare provider, recognizing that in acting as a plan administrator, an HMO functions as a plan fiduciary regulated by ERISA and that in providing treatment of a patient's medical conditions, the HMO functions as a healthcare provider regulated by State malpractice jurisprudence. Analyzing this "dual medical/administrative role[ ] of HMOs," the Supreme Court concluded that an HMO's activities can be placed into three categories: (1) pure administrative eligibility decisions, (2) mixed eligibility and treatment decisions, and (3) pure treatment decisions. *Pegram*, 530 U.S. at 228-29. Pure eligibility decisions relate to "the plan's coverage of a particular condition or medical procedure for its treatment." *Id.* at 228. "'Treatment decisions,' by contrast, are choices about how to go about diagnosing and treating a patient's condition: given a patient's constellation of symptoms, what is the appropriate medical response?" *Id.* Mixed eligibility and treatment decisions exist when those two decisions are "practically inextricable from one another" such that "eligibility decisions cannot be untangled from physicians' judgments about reasonable medical treatment." *Id.* at 228-29. The Court noted that while an HMO acts as an ERISA fiduciary when making pure eligibility decisions, it does not act as an ERISA fiduciary when making pure treatment decisions. Addressing the third category, the Court held that Congress did not intend for any HMO "to be treated as a fiduciary to the extent that it makes mixed eligibility decisions acting through its physicians." *Id.* at 231. The Court explained that "for all practical purposes, every claim of fiduciary breach by an HMO physician making a mixed decision would boil down to a malpractice claim, and the fiduciary standard would be nothing but the malpractice standard traditionally applied in actions against physicians." *Id.* at 235. The Court thus concluded that

"mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA." *Id.* at 237.

Under the teaching of *Pegram*, when an HMO diagnoses and treats a patient's condition with an appropriate medical response, even if it is at the same time also making an eligibility determination, it does not act as a fiduciary under ERISA because the mixed eligibility and treatment decisions as a practical matter reduce to the stuff of State malpractice claims and not to traditional breach of fiduciary duty claims. But when an HMO acts as a fiduciary in relation to an ERISA plan, performing the functions of a fiduciary as defined in ERISA, then a claim against it for breach of that fiduciary duty must be brought exclusively under ERISA.

A person undertaking to act as a fiduciary under ERISA is required to "discharge his duties with respect to [an ERISA] plan solely in the interest of participants and beneficiaries," for the exclusive purpose of "(i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). A person functions as a fiduciary only

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Thus, to the extent that a civil complaint challenges the conduct of a fiduciary, as defined in ERISA and explained by *Pegram*, the complaint must be brought under § 502(a) of ERISA, or not at all.

In this case, Mainstay was a contractor hired by Health Assurance to manage, as a utilization review agent, the behavioral healthcare component of its PPO health plan issued to Mountaineer Retreading. Health Assurance was not an HMO but a preferred provider organiza-

tion or PPO that provided reimbursement for healthcare coverage supplied by third parties. Under the plan, Cleavenger, as a covered employee, was free to choose his own healthcare providers. If he chose a participating provider — one who had a contractual arrangement with Health Assurance or Mainstay to provide healthcare to insureds at an agreed-upon fee schedule — then Health Assurance would pay 100% of the cost of services rendered to Cleavenger. If, on the other hand, Cleavenger chose to go outside the network established by Health Assurance, Health Assurance agreed to pay 80% of the usual and customary charges and Cleavenger would become responsible for the remaining 20%.

Under its contract with Health Assurance, Mainstay did not treat patients. Rather, it managed Cleavenger's utilization of healthcare provided by others to accommodate the benefits of the plan. Thus, it agreed to perform network development, credentialing of healthcare providers, utilization review, and quality assurance functions in the area of behavioral healthcare. And under its utilization review process, Mainstay supplied case managers, such as Shelley Watters, to confirm with healthcare providers that the healthcare being delivered or proposed was approved for payment under the patient's healthcare plan. The case managers, however, had no authority to decline approval for payment. If a case manager was unable to confirm coverage upon reviewing the specifics of the patient's healthcare plan and the applicable medical necessity criteria, the case manager was required to refer the matter to Mainstay's medical director. Most importantly to this case, Shelley Watters was never engaged to actually provide treatment or to make treatment decisions for Cleavenger. And for this reason, the district court concluded that, based on the record before it, "Mainstay never purported to provide Cleavenger with medical services, that Cleavenger's treating physicians were fully insulated from the utilization review procedures performed by Mainstay, and that Watters never spoke directly with Cleavenger's physicians and had no input into Cleavenger's referral to outpatient care."

Cleavenger's estate and representatives of his family as beneficiaries filed their claims against Watters for negligence in the performance of services as a case manager for Mainstay. Although the complaint also attributes to Watters negligent medical treatment deci-

sions, the record indisputably establishes that Watters was never engaged as a provider of medical treatment and that she never made a treatment decision. Indeed, there is no evidence that she even talked with the doctors who did treat Cleavenger. Stated otherwise, there was no evidence that eligibility decisions made by Watters as an independent utilization review agent for Health Assurance were "practically inextricable" from the treatment decisions made by Cleavenger's physicians such that one could conclude that Watters' decisions amounted to mixed eligibility and treatment decisions. Indeed, the record demonstrates that the physician treating Cleavenger neither spoke to Watters nor had even heard of Mainstay. Thus, as the Supreme Court noted in *Pegram*, even though the distinction between pure eligibility decisions and treatment decisions may tend to blur when the treating physician *is also responsible* for making eligibility decisions, as is the case in a traditional HMO, that is not the case here where the treating physicians and Watters were institutionally segregated from one another. Watters worked for an independent utilization review agent that was under contract with Health Assurance, a PPO, and the treating physicians were simply employed by, or connected with, the hospital to which Cleavenger was admitted. Under this arrangement, treatment decisions and eligibility decisions were made by different people at different times according to different policies. Indeed, in this case Mary Ann Iquinto of Sharpe Hospital apprised Watters of medical treatment decisions and diagnoses only after the doctors had *already* made them.

Plaintiffs do not allege that Watters or Mainstay had covert or undisclosed communications with any of Cleavenger's healthcare providers. Rather, they argue that Watters' administration of the plan had the effect of causing the healthcare providers to discharge Cleavenger prematurely. They also allege maladministration of the plan to the extent that Cleavenger's referral to the outpatient facility at University Associates amounted to a violation of Mainstay's "geographic accessibility standards," which elaborate a preference for referring patients to the nearest outpatient facilities. They additionally allege that Watters' conduct was deficient because she did not properly follow up on Cleavenger's outpatient progress as required by the plan. All of these claims, however, attack only Watters' administration of the plan.

Claims challenging the administration of an employee welfare benefit plan fall squarely within the scope of § 502(a) of ERISA. Such claims include allegations that a plan benefit was denied based on noncompliance with the terms of a plan or allegations that an ERISA fiduciary breached a duty to a plaintiff by improperly denying a benefit based solely on financial motivations. The core allegation underlying a § 502(a) claim is that a plan participant or beneficiary was denied a benefit to which the participant or beneficiary was entitled under an ERISA plan or that the manner of administering the benefits caused the participants or beneficiaries some injury. These are precisely the types of claims that plaintiffs are making against Watters and, vicariously, against Mainstay. Plaintiffs cannot transform what is properly considered a § 502(a) claim into a state-law claim for malpractice simply by making unsubstantiated and incorrect statements that an independent utilization review agent was responsible for medical decisions.

In sum, we conclude that plaintiffs' claims are claims for maladministration against Mainstay and Watters that fall within the scope of § 502(a) of ERISA and therefore were properly treated as federal claims and removed to federal court. Accordingly, we affirm the district court's order based on the doctrine of complete preemption, denying the plaintiffs' motion to remand this case to State court.

### III

Taking plaintiffs' claims as claims for breach of fiduciary duty under § 502(a) of ERISA, 29 U.S.C. § 1132(a), we must still determine whether the district court erred in entering summary judgment in favor of Watters and Mainstay for an alleged violation of ERISA. We conclude that the district court did not err.

Plaintiffs have offered nothing more than innuendo to support a claim of wrongdoing by Watters and Mainstay. They argue, for example, that through Watters' administration of the plan, Mainstay channeled Cleavenger to University Associates rather than the more local facility, Valley Center: "It is clear that the reason *why* Mainstay procured Robert Cleavenger's referral to a lower level of care at [University Associates] was motivated by financial considerations . . . . Dr. Wallendjack specifically testified that referring members to a partici-

pating provider inures to the benefit of the PPO." To support this argument, plaintiffs pulled selected references from the record, such as a handwritten note with the words "non-par[ticipating]" next to Valley Center, to suggest that Valley Center was *not* a participating provider in the Health Assurance network, while University Associates was. Plaintiffs' assertion, however, is disingenuous, because in fact, *both* University Associates and Valley Center were participating providers in October 1998. When faced with this fact at oral argument, plaintiffs' counsel revised their position, arguing that Watters and Mainstay channeled Cleavenger away from Valley Center because, although it was a participating provider, Watters and Mainstay *thought* it was not. This argument, too, is supported by nothing more than innuendo.

The uncontroverted facts support both that Cleavenger insisted on leaving Sharpe Hospital to return to work and that he expressed a preference for the further-away outpatient facility. Cleavenger was only released from Sharpe Hospital after a team of doctors, nurses, and a social worker determined that he could not legally be kept against his will based on his medical condition at the time. The thrust of plaintiffs' complaint is directed at this medical decision made by other defendants and not against the administration provided by Watters and Mainstay. Whether plaintiffs can establish a breach of duty giving rise to malpractice against defendants other than Mainstay and Watters for releasing Cleavenger and sending him to University Associates is a question on which we express no opinion because that forms the core of plaintiffs' State malpractice claims against the healthcare providers. We only conclude that, on the record before us, the facts do not support a claim that Mainstay and Watters breached any fiduciary duty in violation of ERISA.

For the foregoing reasons, the district court's order granting summary judgment to Watters and Mainstay is affirmed.

*AFFIRMED*