[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2003
THOMAS  K. KAHN
CLERK

_____

No. 02-15549

_____

D. C. Docket No. 02-00470-CV-J-20

ROBBIE LEE LAND,
DONNA LAND,

Plaintiffs-Appellants,

versus

CIGNA HEALTHCARE OF FLORIDA,
a Florida Corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 30, 2003)**

Before MARCUS and WILSON, Circuit Judges, and RESTANI\*, Judge.

_____

\*Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by
designation.

WILSON, Circuit Judge:

Robbie Lee Land appeals the district court's order denying his motion to remand and granting CIGNA Healthcare of Florida's motion to dismiss.[1] The principal issue in this case is whether Land's state law malpractice claims against his health maintenance organization (HMO) were preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. We conclude that they were not preempted, and, therefore, we vacate and remand to the district court with instructions to remand this case to state court.

## BACKGROUND

Land was a subscriber through his employer to a health care plan administered as an HMO by CIGNA. On January 14, 2001, Land was bitten on his left hand by his family cat. Later that afternoon, he noticed that his hand had become swollen and inflamed, and the next day he sought treatment at a hospital emergency room where he was treated by Dr. John C. Crick, a CIGNA-approved hand specialist. Dr. Crick diagnosed him with cellulitis, ordered that he be given an injection of antibiotics in the emergency room, and prescribed an additional

---

[1]Donna Land, Land's wife, also appeals the district court's order as it pertains to the dismissal of her joint state law claim for the loss of her husband's services, comfort, society, and attention. Because we vacate the order in its entirety, it is not necessary to address her claims separately.

2

course of antibiotics to treat the infection.  Dr. Crick reevaluated Land's hand the following day and found no improvement in his condition.  As he observed that Land's hand still was swollen and that there was limitation of motion in the joints, Dr. Crick began to suspect that Land was suffering from osteomyelitis, a more serious infection than cellulitis.

In developing a course of treatment for the infection, Dr. Crick conferred with Dr. David Gouch, Land's primary care physician.  After consulting with each other, the physicians ordered that Land be admitted into the hospital immediately for aggressive intravenous antibiotic treatment and constant monitoring and assessment of his infection to determine whether surgery or modified antibiotic treatment would be necessary.  Land was admitted into the hospital that same day and placed on intravenous antibiotics.

Land alleges that shortly after his admission into the hospital, a CIGNA approval nurse reviewed the proposed plan of treatment for his infection.  The nurse approved the use of intravenous antibiotic therapy, but determined that he was suffering from a localized infection that did not require hospitalization.  The nurse thus decided that the treatment should be provided on an outpatient basis in Land's home rather than on an inpatient basis in the hospital, and Land was discharged that evening.

3

By the following week, Land's condition had worsened considerably, and he developed an abscess extending into the joint between his hand and middle finger. Outpatient surgery was performed to drain, irrigate, and debride the metacarpophalangeal joint of his hand. A pathology report on the removed tissue revealed that Land was suffering from severe chronic inflammation, focal necrosis, and the presence of Pasteurella multocida, an organism that can cause serious infection and even death. When his condition failed to improve, Land underwent a second surgery, and, following that operation, he was diagnosed with osteomyelitis of the third metacarpal of the left hand. The condition of Land's hand continued to deteriorate over the course of the next few weeks, and he underwent additional surgeries to debride his metacarpal bone and totally replace his metacarpophalangeal joint. None of those surgeries successfully repaired the damage caused by the infection, however, and, ultimately, his middle finger had to be amputated.

After losing his finger, Land filed suit against CIGNA in state court, alleging that CIGNA was negligent in the care and treatment of his infection. CIGNA removed the case to federal court, asserting that Land's claims implicated ERISA and therefore raised a federal question. Land moved to remand the case to state court, but the district court denied that motion and granted CIGNA's motion

to dismiss Land's complaint without prejudice, determining that his state law claims were completely preempted by ERISA. Land filed an amended complaint, which also was dismissed without prejudice, and, shortly thereafter, he filed this appeal.

## STANDARD OF REVIEW

"We review *de novo* the district court's grant of a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."[2] *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam). We also review the denial of a motion to remand de novo. *See Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1211 (11th Cir. 1999). "We review *de novo* the district court's ERISA preemption analysis." *Hall v. Blue Cross/Blue Shield of Ala.*, 134 F.3d 1063, 1064–65 (11th Cir. 1998).

## DISCUSSION

Essentially, this case is reduced to a jurisdictional issue – whether the district court had original jurisdiction over Land's claims, thereby making removal

---

[2]Although the district court did not state in its order that it was granting CIGNA's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), we assume that the court granted the motion on this ground based upon CIGNA's affirmative defense that Land's claims were subject to federal preemption. *See Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984) (recognizing that the affirmative defense of federal preemption can be the basis of a Rule 12(b)(6) motion).

proper, or whether the court lacked jurisdiction and should have remanded the case to state court.  Land argues that because his claims were state law malpractice claims, they were not preempted by ERISA and the district court therefore should have granted his motion to remand.  CIGNA, however, argues that Land's malpractice claims were claims challenging the denial of benefits and thus were completely preempted by ERISA.

"A defendant may remove a case to federal court only if the district court would have had jurisdiction over the case had the case been brought there originally.  A federal district court has original jurisdiction over diversity cases and cases arising under federal law." *Kemp v. Int'l Bus. Machs. Corp.*, 109 F.3d 708, 711–12 (11th Cir. 1997) (citation omitted).  In this case, there was no diversity between the parties, so the district court had jurisdiction over the action only if it was based upon a matter arising under federal law.  *See* 28 U.S.C. § 1331.

"Ordinarily, a cause of action does not arise under federal law unless the plaintiff's well-pleaded complaint presents a federal question." *Hall*, 134 F.3d at 1065 (internal quotation marks omitted).  We have recognized, however, that

> there is a qualification to the well-pleaded complaint rule: a doctrine
> known as "complete preemption" or "super preemption."  Under that
> doctrine, Congress may preempt an area of law so completely that any

> complaint raising claims in that area is necessarily federal in character and therefore necessarily presents a basis for federal court jurisdiction.

*Kemp*, 109 F.3d at 712. Although super preemption is exceedingly rare, the United States Supreme Court has held that Congress created such preemption in section 502(a) of ERISA, 29 U.S.C. § 1132(a), and, therefore, all "causes of action within the scope of the civil enforcement provisions of § 502(a) [are] removable to federal court." *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65–66 (1987). Thus, if Land seeks relief that is available under section 502(a), there was federal question jurisdiction and removal of his case to district court was appropriate. If he did not seek such relief, however, the district court had no jurisdiction over his claims and remand to state court was required.

Section 502(a)(1)(B) provides that an ERISA plan "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Therefore, to determine whether Land seeks relief under section 502(a)(1)(B), we must consider whether his claims fall within the scope of one of those three categories. As we do not believe that Land's claims can be characterized as claims seeking "to clarify his rights to future benefits" or "to

7

enforce his rights under the terms of [his health care] plan," they must be considered claims "to recover benefits" that were denied when the approval nurse decided not to authorize inpatient treatment for his infection to fall under section 502(a)(1)(B) and thereby be completely preempted. *Id.*

We cannot ascertain whether Land's claims are claims seeking to recover benefits without first determining what type of decision the approval nurse made when she denied authorization of inpatient treatment for Land's infection. CIGNA contends that this merely was an eligibility[3] decision pertaining to Land's benefits under the plan, but Land asserts that it was a treatment decision relating to the actual care of his infection. In resolving this issue, we rely heavily upon the Supreme Court's decision in *Pegram v. Herdrich*, 530 U.S. 211 (2000).

In *Pegram*, the Court held that a patient could not state a claim against her HMO under section 502(a)(2) based upon her physician's malpractice, because the HMO did not act "as a fiduciary to the extent that it ma[de] mixed eligibility decisions acting through its physicians." *Id.* at 231. The plaintiff, Cynthia Herdrich, became Dr. Lori Pegram's patient through her HMO, which was owned and operated by a group of physicians that included Dr. Pegram. *Id.* at 215. After

---

[3]Courts have used the terms "eligibility" and "coverage" interchangeably, but for the sake of clarity, we hereinafter refer to these types of decisions as eligibility decisions.

examining Herdrich, Dr. Pegram discovered that a mass in her abdomen was inflamed, but rather than order an immediate ultrasound at a local facility, she made Herdrich wait eight days until the ultrasound could be performed at a facility more than fifty miles away. *Id.* During that period, Herdrich's appendix ruptured, and, as a result, she sued Dr. Pegram and the HMO for medical malpractice under state law and for breach of fiduciary duty pursuant to section 502(a)(2), alleging that the physicians' ownership of the HMO created an incentive to make decisions in their self-interest rather than in the interests of the plan participants. *Id.* at 215–16.

In addressing the merits of Herdrich's claims, the Court first acknowledged the unique way in which HMOs operate, noting that to control costs, "they commonly require utilization review (in which specific treatment decisions are reviewed by a decisionmaker other than the treating physician) and approval in advance (precertification) for many types of care, keyed to standards of medical necessity or the reasonableness of the proposed treatment." *Id.* at 219. The practices of utilization review and precertification require HMOs to make decisions that blur the lines between an HMO's role as an ERISA fiduciary and its role as a health care provider. *See id.*

9

In its effort to characterize the substance of Herdrich's claims, the Court

acknowledged the difficulty of distinguishing between the dual medical and

administrative roles of HMOs and identified the following types of HMO

decisions:  eligibility decisions, treatment decisions, and mixed eligibility and

treatment decisions.  *Id.* at 228–29.  The differences between these types of

decisions were explained as follows:

> What we will call pure "eligibility decisions" turn on the plan's
> coverage of a particular condition or medical procedure for its
> treatment.  "Treatment decisions," by contrast, are choices about how
> to go about diagnosing and treating a patient's condition: given a
> patient's constellation of symptoms, what is the appropriate medical
> response?
>
> These decisions are often practically inextricable from one
> another . . . .  This is so not merely because, under a scheme like [the
> utilization review process in this case], treatment and eligibility
> decisions are made by the same person, the treating physician.  It is so
> because a great many and possibly most coverage questions are not
> simple yes-or-no questions, like whether appendicitis is a covered
> condition (when there is no dispute that a patient has appendicitis), or
> whether acupuncture is a covered procedure for pain relief (when the
> claim of pain is unchallenged).  The more common coverage question
> is a when-and-how question.  Although coverage for many conditions
> will be clear and various treatment options will be indisputably
> compensable, physicians still must decide what to do in particular
> cases.  The issue may be, say, whether one treatment option is so
> superior to another under the circumstances, and needed so promptly,
> that a decision to proceed with it would meet the medical necessity
> requirement that conditions the HMO's obligation to provide or pay
> for that particular procedure at that time in that case. . . .  In practical
> terms, these eligibility decisions cannot be untangled from
> physicians' judgments about reasonable medical treatment . . . . The

eligibility decision and the treatment decision [a]re inextricably mixed, as they are in countless medical administrative decisions every day.

*Id.* The Court thus concluded that Dr. Pegram's decision was a mixed eligibility and treatment decision, which was not fiduciary in nature and therefore did not state a claim for breach of fiduciary duty under section 502(a)(2). *See id.* at 231, 237.

Although *Pegram* is not dispositive because the issue of preemption was not before the Court, we find compelling persuasive force in the Court's unanimous ruling and believe that it provides us with guidance in determining the true nature of Land's claims. Thus, with *Pegram*'s description of the three types of HMO decisions in mind, we turn to the question of whether the approval nurse's decision to authorize outpatient rather than inpatient treatment of Land's infection was an eligibility decision, a treatment decision, or a mixed decision. To answer this question, we must parse the allegations of Land's amended complaint. *See id*. at 227.

We believe that the crux of Land's claim is found in the following allegations of the amended complaint:

> 16. Although Defendant, CIGNA, approved the intravenous antibiotic therapy benefits to the Plaintiff, CIGNA's approval nurse made a medical decision that the intravenous therapy should be

provided on an "out-patient" basis in Plaintiff's home instead of as an "in-patient" at St. Vincent's Medical Center.

17. This CIGNA approval nurse based her medical decision for treatment on her classification of the wound as a localized infection rather than the correct diagnosis made by Dr. Crick of cellulitis (a widespread, non-localized infection.)[.]

18. Defendant's substitution of a lower quality of care ("out-patient" therapy as opposed to "in-patient" therapy,) was the direct and proximate cause of the failure to timely and appropriately treat the Plaintiff's ongoing, widespread infection, as more specifically set forth in the allegations below.

19. The Defendant, CIGNA, in its capacity as a health care provider, had a duty to provide appropriate medical treatment under the prevailing standard of medical care in Florida, and assumed the duty when the approval nurse made her diagnosis and treatment decision.

20. On January 16, 2001, Defendant, CIGNA, made a negligent diagnosis and negligent treatment decision when the approval nurse elected to have Plaintiff treated in his home for a localized infection, rather than at St. Vincent's Medical Center for cellulitis (the correct diagnosis).

Taking these allegations as true, as we are required to do when considering

the dismissal of a complaint, *see Hill*, 321 F.3d at 1335, we conclude that the

approval nurse made a mixed eligibility and treatment decision, because the

decision was not a simple yes-or-no eligibility determination about whether

CIGNA would cover treatment for cellulitis; rather, the eligibility decision was

intertwined with the approval nurse's medical decision that inpatient treatment of

Land's infection was unnecessary. Indeed, Land alleges that inpatient treatment of

his infection would have been covered had the approval nurse correctly

12

determined that he was suffering from cellulitis rather than a localized infection. Based upon that allegation, we believe that the approval nurse "made a patient-specific prescription of appropriate treatment by denying one treatment and authorizing another." *Cicio v. Does*, 321 F.3d 83, 104 (2d Cir. 2003).

This is just the kind of decision about "the reasonableness of a certain treatment, and the emergency character of a medical condition" that the Supreme Court has identified as a mixed eligibility and treatment decision. *See Pegram*, 530 U.S. at 230. Land's allegations thus can be analogized to the way Herdrich's physician

> decided (wrongly, as it turned out) that Herdrich's condition did not warrant immediate action; the consequence of that medical determination was that [the HMO] would not cover immediate care, whereas it would have done so if Dr. Pegram had made the proper diagnosis and judgment to treat.

*Id.* at 229. Therefore, because the approval nurse made a medical decision that inpatient care was not "so superior . . . under the circumstances, and needed so promptly, that a decision to proceed with it would meet the medical necessity requirement that conditions the HMO's obligation to provide or pay for that particular procedure at that time in that case," we find that the decision was a mixed decision. *Id.*

13

Having determined that Land's malpractice claims were not based upon a pure eligibility decision, but rather upon a mixed decision of eligibility and treatment, we must consider whether mixed decision claims are claims "to recover benefits" under section 502(a)(1)(B) and therefore completely preempted. Once again, we find the reasoning of *Pegram* persuasive. In reaching its conclusion that an HMO does not act as a fiduciary when it makes a mixed eligibility and treatment decision, the Court reiterated its prior holding "that, in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose." *Id.* at 237. The Court therefore expressed strong doubt that Congress intended to federalize and preempt state law malpractice claims by converting them to fiduciary claims under section 502(a)(2) or to "apply[] an ERISA standard of reasonable medical skill."[4] *Id.* at 236. In our view, it makes little sense to believe that Congress did not intend to federalize malpractice claims under section 502(a)(2), but intended to do so under section 502(a)(1)(B).

---

[4]Although the Court expressed doubt that Congress intended for ERISA to preempt medical malpractice claims, it was not called upon to decide the issue of preemption in that case and therefore declined to consider whether Herdrich could have stated a claim under section 502(a)(1)(B) to recover benefits, or whether her state law malpractice claim was preempted by section 502(a)(1)(B). *See Pegram*, 530 U.S. at 229 n.9.

14

Indeed, our own precedent casts doubt upon the idea that section 502(a)(1)(B) preempts medical malpractice claims. As that section allows a plan beneficiary or participant "to recover benefits due to him under the terms of his plan," ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), we have held that claims seeking to recover benefits under section 502(a)(1)(B) essentially are contract claims, *see Harrison v. Digital Health Plan*, 183 F.3d 1235, 1241 (11th Cir. 1999) (per curiam) (finding that "an employer's obligation to provide medical benefits under an ERISA plan is contractual. A plaintiff's action to enforce the medical benefits provision of a self-funded ERISA plan is essentially a lawsuit by an employee against her employer for breach of contract" (citation omitted).); *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam) ("A plaintiff suing under [section 502(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits."). In this case, however, we do not believe that Land's claims can be characterized as contract claims, because he does not allege that he was denied medical benefits and he does not seek reimbursement for his medical expenses; rather, he claims that the HMO's failure to diagnose his condition correctly and authorize the proper medical treatment resulted in the loss of his finger. Land's claims, therefore, are tort

claims based upon the duty of care rather than contract claims based solely upon a

denial of benefits.[5]

As a result, Land's claims do not fall "within the scope of the civil

enforcement provisions of § 502(a)," *Taylor*, 481 U.S. at 66, and thus are not

completely preempted.[6]  Therefore, Land's complaint did not present a federal

_____

[5]Because we find that Land is not challenging a denial of benefits, we believe that CIGNA's reliance upon the Supreme Court's decision in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 (1987), is misplaced.  In that case, the Court held that "the civil enforcement scheme of ERISA makes clear its intention that all suits brought by beneficiaries or participants asserting improper processing of claims under ERISA-regulated plans be treated as federal questions governed by § 502(a)."  *Id.* at 56.  The plaintiff in that case challenged his insurance company's termination of his disability benefits, asserting state law claims for breach of contract, breach of fiduciary duty, and fraud in the inducement.  *Id.* at 43.  The Court held that "§ 502(a) [was intended to] be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits" and thus concluded that the plaintiff's state law claims were preempted. *Id.* at 52.  As we do not believe that Land's malpractice action is based solely upon the improper processing of a claim, *Pilot Life Insurance Co.* does not foreclose our holding in this case.

[6]We therefore reach the same result as the Second and Fifth Circuits.  *See Cicio*, 321 F.3d at 102 ("conclud[ing] that a state law malpractice action, if based on a mixed eligibility and treatment decision, is not subject to ERISA preemption when that state law cause of action challenges an allegedly flawed medical judgment as applied to a particular patient's symptoms" (internal quotation marks omitted)); *Roark v. Humana, Inc.*, 307 F.3d 298, 309 (5th Cir. 2002) (finding that "ERISA provides no cause of action for medical malpractice claims against an HMO" and that such claims therefore are not preempted by section 502(a)(1)(B)), *petition for cert. filed*, 71 U.S.L.W. 3791 (U.S. June 3, 2003) (No. 02-1826).

We find additional support for our holding in decisions of the Fourth and Third Circuits, which cited *Pegram* with approval, but nevertheless concluded that the plaintiffs' claims were preempted.  *See Marks v. Watters*, 322 F.3d 316, 324, 327 (4th Cir. 2003) (recognizing *Pegram*'s teaching that "mixed eligibility and treatment decisions as a practical matter reduce to the stuff of State malpractice claims and not to traditional breach of fiduciary duty claims," but determining that the plaintiff's HMO did not make a treatment determination when the decision to release him from psychiatric care was made solely by his physician and the HMO case manager had no input in that decision); *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 274 (3d Cir. 2001) (citing *Pegram* with approval and reiterating the validity of its prior holdings that state law

16

question and removal jurisdiction was inappropriate. The district court thus lacked subject matter jurisdiction over this case and remand to state court was required.[7]

## CONCLUSION

Based upon the foregoing, we VACATE the district court's order granting the motion to dismiss and REMAND to the district court with instructions to REMAND this case to state court.

---

claims are not preempted when "the HMO . . . assume[s] the dual role of an administrator of benefits and a provider of medical services," but finding that the plaintiff's claims "[we]re limited to [the HMO's] delay in approving benefits, conduct falling squarely within [the] administrative function").

[7]Our decision that Land's claims are not subject to complete preemption does not end the preemption inquiry, because his claims still may be subject to defensive preemption (also known as conflict preemption) under section 514(a) of ERISA, 29 U.S.C. § 1144(a). *See Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997) (per curiam) (holding that under section 514, a state law claim is subject to "ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits"). Because the district court does not have jurisdiction over this case, however, this will be a matter for the state court to decide upon remand, and our decision today should not be read to express any opinion as to whether Land's claim is conflict preempted. *See Kemp*, 109 F.3d at 714 (noting that if a federal court lacks jurisdiction, it "cannot decide a preemption defense").